**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **BECKY McCLAIN,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **3:06-cv-01795 (VLB)** |
| **PFIZER, INC.,** | : | |
| **Defendant.** | : | **February 26, 2010** |

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART THE

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. # 134]

The Plaintiff, Becky McClain (hereinafter "McClain") initiated this action against her former employer, Pfizer, Inc. ("Pfizer"), and presently asserts three claims for relief pursuant to diversity jurisdiction: 1) that Pfizer terminated her in violation of Connecticut General Statutes § 31-51m (the "whistleblower statute"); 2) that Pfizer terminated her for exercising free speech in violation of Connecticut General Statutes § 31-51q; and 3) that Pfizer engaged in willful and wanton misconduct that harmed McClain in violation of Connecticut common law.

Pfizer now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against McClain.  [Doc. # 134].  Pfizer contends that McClain fails to assert sufficient evidence that would permit a reasonable trier of fact to find in her favor [Id.].  For the reasons stated hereafter, the Defendant's motion for summary judgment is granted as to McClain's common law willful and wanton misconduct claim due to the exclusivity provision of the Workers' Compensation Act, the Plaintiff's inability to satisfy the substantial

certainty requirement, and failure to demonstrate Pfizer's corporate responsibility for the alleged conduct.  Pfizer's motion is denied however, as to McClain's §31-51m claim as there is sufficient evidence to withstand the applicable <u>McDonnell Douglas</u> burden shifting analysis.  McClain's claim is also denied as to McClain's § 31-51q free speech claim as there is sufficient evidence that she was subject to an adverse employment action after speaking on an issue of public concern.

<u>Factual and Procedural History</u>

The following facts are undisputed for the purpose of the Defendant's motion for summary judgment unless otherwise noted.  McClain worked as a scientist for Pfizer starting in 1995 until May 26, 2005.  Her responsibilities included molecular biology research and studies relating to vaccine development.  Starting in 2000 and until September of 2003, McClain worked in Lab 313 of Pfizer's Groton, Connecticut facility under the supervision of John Hambor ("Hambor").

In September of 2002, McClain smelled a noxious odor while working under a laminar hood that she claims made her nauseous.  A laminar hood is a laboratory structure that provides airflow through a work access opening to serve as a barrier against contamination and prevent a cell culture's exposure to microbes such as bacteria.  During the relevant period, Pfizer tested its laminar hoods annually to confirm their air flow rates and ensure proper operation. Following the September incident, Pfizer took various steps to fix the laminar

2

hood, including the hiring of an outside vendor to clean the hood, replace filters

within the hood, and eventually replace the hood in its entirety.  Evidence on the

record indicates that Pfizer also replaced the hood in its entirety a second time.

[Doc# 137, Exh. 20].

Pfizer contends that they did not experience problems with the laminar

hood after April 2003 [Doc. #135, pg. 8].  Email correspondence from Hambor to

Pfizer management reflects that the cause and occurrence of the noxious odor

remained unresolved as of April 8, 2003:

> I am writing to request an investigation into identifying the exact
> causative agent that is present in our lab which continues to make
> Becky and I sick . . . in September 2002, when we were doing some lab
> work using the laminar flow hood (which is directly vented into the lab)
> and noticed a noxious odor.  That evening we both became very ill
> (headache, nausea and vomiting) . . . the filter on that hood was
> replaced which made the repair technician ill (same symptoms).  The
> filter was removed . . . When the blower on the hood was turned on with
> the new filter in place, the odor was still evident.  Next, we were asked
> to run the hood over the weekend to try and clear any residual "odor"
> . . . When we came into work the following Monday, we found that the
> odor still was evident when the blower was turned on.  We also learned
> that the cleaning personnel who maintains our lab became ill on Friday
> evening with the same symptoms after being exposed to the noxious
> odor . . . The next step was to replace the hood . . . A brand new hood
> arrived in January and was installed.  Upon turning the blower for the
> first time, we noticed the same smell . . . the ceiling tiles over the hood
> were replaced, but this still did not eliminate the noxious odor coming
> from the hood . . . Recently a charcoal filter was installed . . . The day
> after it was installed, both Becky and a person from Safety became
> nauseous  . . . every instance the hood has been turned on over the
> past 7 months, we immediately smelled the odor, became ill and had to
> evacuate the lab . . .

[Doc. #146, Exh. 1].   At her deposition, McClain testified that "September of '02

was the first noxious odor exposure, and that occurred all the way through

3

August 2003 as far as I can recall." [Id.]  Lastly, correspondence from Pfizer to the

Occupational Safety and Health Administration (OSHA), dated February 4, 2005

indicates that the noxious odor did not abate until August 2003:

> A metal frame HEPA filter was installed and the air flow was
> adjusted, but the odors persisted.  The hood was again replaced in
> August 2003, including the filter and related housing.  The duct work
> on the new hood was vented into the lab (the same design as the
> original hood) No issues or odors complaints were reported with the
> second new hood.

[Doc# 137, Exh. 20].

McClain attests that Hambor frequently advised her not to "make [too] big

an issue out of safety in the lab" and on or about February 4, 2003, Hambor

confronted her and indicated that he could negatively impact her career through a

poor performance review. [Doc. #146, Affid. 1, para. 11].  McClain also attests:

> While working at Pfizer, other serious safety concerns came to my
> attention.  I attempted to remedy my concerns within our department
> with several meetings with management and within the safety
> committee which I was a member.  Documented safety complaints were
> ignored and verbal safety concerns were laughed off by Pfizer
> management.  I also requested a transfer to another department at
> Pfizer at least on two occasions in 2003.  But Pfizer refused to address
> my safety concerns or offer me a transfer to another department.
> Coincidently, due to management's posture regarding safety, co-
> workers were expressing to me their fear to raise safety concerns with
> management.  This intensified my apprehension regarding raising
> safety concerns within GPS at Pfizer.

[Doc. #146, Affid. 1, para. 12].  The documented safety complaints to which

McClain referred are not part of the record.

Starting in September 2003, McClain reported to a new supervisor,

Wenning Qin, but continued to work in lab 313.  McClain asserts that two months

after the odor abated, during November 2003, senior scientist William Blake

("Blake") indicated that he had been, and still was working with a strain of biological material known as lentivirus and inquired whether she considered it a dangerous substance. [Id., para. 14]. McClain claims that between October and November of 2003, Blake worked with lentivirus on a laboratory bench in B313. She claims that she never received warning about the use of the lentivirus agent in the laboratory space, and that appropriate precautionary measures were not taken to prevent her exposure to the lentivirus: "I was shocked and appalled to find he had been using lentivirus materials on an open lab bench without biocontainment where I performed my office work (e.g. without gloves) in October 2003." [Id.]. McClain also encountered an unidentified experiment set-up consisting of cell cultures on her laboratory bench. McClain does not specifically recall touching the unidentified experiment items, but notes that the experiment was performed on a bench space that was not decontaminated for a month. [Doc. #137, Exh. 1, pg. 160].

Pfizer contends that any lentivirus used in the relevant laboratories was not derived from a human infectious virus and was not infectious because they lacked genes for replication. [Doc. #137, Exhs. 2-4]. Pfizer contends that the materials Blake worked with in Lab 313 consisted of mouse embryonic stem cells that were transduced with lentivirus. [Id.] Transduction is the process by which a carrier of genetic information, such as a virus, introduces genetic information into a cell. Pfizer performed transduction with lentivirus in order to introduce a green fluorescent protein into mouse embryonic stem cells. The application of

5

the lentivirus to transduce the cell lines occurred in Lab 252, which is located in a different building.  Deposition testimony reflects that transductions were performed in room 252 because it had a biological safety cabinet with an incubator designated for the transduction of cultures and that the transduced cultures were brought to laboratory 313 for analysis under a flow cytometer located in that particular laboratory [Doc. #137, Exh. 2, pgs. 48, 50].  Pfizer contends that the transduced cells did not contain lentivirus and were not dangerous.  In a June 3, 2005 email, Hambor notes that the cells "were washed free of 'live' virus" before they were brought to laboratory 313 for analysis on a flow cytometer [Doc. # 144, Exhibit 3].

Between late December 2003 and early January 2004, McClain moved out of laboratory 313 [Doc. #146, Affid. 1, para. 13].  In late January, 2004, Pfizer issued a performance review, drafted in part by Hambor, that rated McClain's work as "Partially Meets Performance Expectations."  McClain submitted a rebuttal of her review on February 16, 2004.  She believed that Hambor was retaliating against her for voicing concerns about safety in the laboratory and that her review was inaccurate.

One week later, on February 23, 2004, the Plaintiff began a medical leave of absence due to stress and symptoms that she initially believed were caused by either multiple sclerosis or Lyme Disease.  Despite seeing several doctors and undergoing a battery of tests, McClain has not received a concrete diagnosis, and doctors have disputed the cause of her symptoms, which include complete

6

paralysis of her body up to twelve times each month. [Doc. #146, Affid. 1, para.

19].  Diagnosis has included: transient hypokalemic periodic paralysis, based on

a low potassium count immediately after an attack of temporary paralysis; post-

viral arthopathy; psychosomatic paralysis; and Lyme disease or ehrlichiosis due

to a tick bite. [Doc. #137, Exhs. 31-58]. McClain notes:

> I saw several medical providers . . . I was tested for Lyme Disease and
> this was negative.  I was also treated . . . after a tick bite to avoid
> complications to my ongoing illness and never tested positive for any
> tick-borne illness to my knowledge.  Meanwhile, my illness slowly but
> progressively became worse to the point where I began to have
> intermittent periods of time where I was paralyzed.

[Doc. #146, Affid. 1, para. 19].

McClain does not have a conclusive diagnosis.  This is due in part, to

McClain's negative testing for the genetic markers affiliated with periodic

paralysis and uncharacteristic midlife onset of the disorder.  [Doc. #137, Exhs. 31-

58].  McClain and at least one physician contend that her unique symptoms could

be due to an exposure to genetically manipulated viral matter while at Pfizer.

[Doc. #146, Aff. 1, Exh. 7].   In a July, 2006 request for information relating to

Pfizer's viral agents, infectious disease specialist Dr. Jane Buss notes:

> [T]he above requested information will be used to try to diagnose
> Becky's unusual constellation of symptoms.  If she was infected by a
> genetically engineered viral particle, there is no standard laboratory
> test available to detect its presence.  We are most concerned with
> establishing a diagnosis so we can consider treatment options sooner
> rather than later.  Therefore, I am hopeful for an immediate response to
> the above requests in order to expedite her medical evaluation . . . I
> have been following Becky for two years and all routine testing has
> failed to diagnose her condition.[1]

---

[1] During the course of this action, McClain has alleged on multiple occasions that Pfizer has failed
to meet Dr. Buss' request, and subsequent requests made by and on behalf of McClain, for the

[Doc. #146, Exh. 7].

McClain's medical leave ended on June 24, 2004 when her doctor cleared her to return to work.  McClain however did not return to work as she and her attorney entered negotiations with Pfizer initially regarding her work conditions and ultimately about severance.  [Doc. #137, Exh. 1, 13-14].  On October 8, 2004 Pfizer wrote McClain's attorney, noting accommodations made to address her issues with Hambor, her laboratory set-up, and prior performance review.  On October 13, 2004, McClain returned to Pfizer for a four hour meeting to discuss her potential return, but the parties were unable to agree upon final arrangements.  Pfizer continued to pay McClain through October 26, 2004 and the parties continued to negotiate arrangements for her return until Pfizer terminated McClain on May 26, 2005.  McClain attests:

> I attended meetings at Pfizer and it was my understanding that safety in the lab where I would be working would be discussed.  We had looked for and asked for assurances from Pfizer that my work environment would be safe and these were never given to us.  These meetings were held in or around October of 2004, toward the end of a medical leave which I took due to joint and neuro-muscular pain, numbness and an inability to sleep.  As a result of the fact that there were no on-going assurances regarding lab safety, I believed that I could not safely return

---

disclosure of information relating to the genetic sequencing of viral material used at Pfizer during the relevant period. [Docs. ##148, 156, 162, 171].  The Court has worked with the parties to address the discovery dispute, and resolved the matter during a teleconference on December 2, 2009. [Id.]  McClain has not renewed her allegations that Pfizer has failed to disclose all evidence in its possession that could aid in her diagnosis and demonstrate that her illness was caused by the lentivirus strain.  Accordingly, the Court will rule on this motion based upon evidence that is on the current record and will not create an issue of material fact by speculating "about what additional discovery might uncover." Contemporary Mission, Inc. v. Untied States Postal, 648 F.2d 97, 107 (2d Cir., 1981) (noting that "it is clear that a plaintiff cannot defeat a motion for summary judgment by merely restating the conclusory allegations contained in his complaint" and that an "opposing party's mere hope that further evidence may develop prior to trial is an insufficient basis upon which to justify the denial of the motion.")

to work until appropriate safety discussions could be formalized and negotiated.  On one such meeting sometime around October 12, 2004, I meet [sic] with HR at Groton labs and it was agreed that Pfizer would arrange a meeting with me, with my attorney, Pfizer legal and HR in the very near future, to address such issues in order to return to work.  They assured me that they would contact me.  No such meeting was organized and instead on October 20, 2004, I was sent a letter form Pfizer HR placing me on unpaid leave and threatening termination effective October 26, 2004 due to job abandonment unless I returned to work immediately with no opportunity to address my safety issues . . . at another meeting sometime in November 2004 where Pfizer legal and management avoided any discussions regarding safety, and instead only focused on my performance, verbally labeling me "a non-team player" and only interested in probing for details about the hostile incident by my supervisor, John Hambor.  I was verbally placed on unpaid leave until a resolution could be made through my attorney and Pfizer's attorney.  Without ever having the opportunity to have a meeting to specifically discuss my safety concerns or to provide assurances of a safe environment, I was terminated in May of 2005 after I had filed an OSHA complaint and after I had recently begun requesting exposure records due to my continued and progressively worsening illness.

[Doc. #146, Affid. 1, para. 15].

On November 18, 2004, within a month of being placed on unpaid leave and six months prior to her official termination, McClain filed a wrongful termination complaint with the United States Department of Labor, Occupational Safety and Health Administration ("OSHA"), and Pfizer received notice of the complaint on January 20, 2005.  The notice identified that McClain alleged the following safety and health hazards:

Pfizer's current safety policy fails to provide a reasonable and formal forum for employees to bring forward safety issues without the fear of retaliation and does not allow their concerns to be addressed by management in a timely and well-communicated fashion . . . Pfizer has established a safety policy where upper management is making unilateral decisions about biological laboratory safety without consideration of what is actually being done in the lab, the risks

9

involved and without input from bench scientists . . . Pfizer places pressure on people to perform by mandating they "double their productivity", but do not provide adequate break room facilities, adequate computer room facilities outside the laboratory nor proper training for individuals using "unique" biohazards in order to perform at this level without sacrificing safety practices . . . Pfizer's policy on reported "hostile incidents" are not taken seriously and in fact when reported become a detriment to the victims in term of their perception to management . . . I believe my health and my career have been damaged at Pfizer involving these claims above, leading to my wrongful termination, I believe that I have received a negative evaluation because of my safety complaints and the repercussions of a hostile work environment.

[Doc. # 137, Exh. 18].

In responding to an OSHA Complainant Follow-up Questionnaire on

January 20, 2005, McClain further noted:

I refused to return to laboratory work until after I was allowed a meeting with Pfizer legal to discuss safety issues, the hostile work environment and potential retaliation to the complaints I had made.  I had reason to believe my workplace was intolerable . . . I had reason to believe that my work environment caused my illness . . . I returned to work for one day in October and found nothing changed in regard to laboratory safety or hostile work environment (as far as I could detect, anyway) . . . My understanding from HR while I was there was that a meeting was to be set up within a few days or as soon as possible.  Instead of receiving notification of a meeting, however, I received a letter stating that my pay was suspended and that I would be terminated due to job abandonment on 10/26/04.

[Doc. # 137, Exh. 19].

On February 25, 2005, McClain filed a claim with the Connecticut Workers'

Compensation Commission, noting that she suffered an illness that related to

exposures while at Pfizer.  On November 17, 2005, Thomas J. Guilmartin, Area

Director of OSHA notified McClain by letter that her wrongful termination

complaint was dismissed and she appealed the decision on December 2, 2005.

10

There was no reference in the letter to a determination made by a "Regional

Administrator." [Doc. #137, Exh. 21].  On March 2, 2006, Richard E. Fairfax

("Fairfax") the Director for Directorate of Enforcement of OSHA communicated

the denial of her appeal, noting:

> Based on a complete and comprehensive review of the entire
> investigative file and related documents, I have concluded that . . . your
> refusal to return to work despite Pfizer's substantial efforts to address
> your concerns, insistence on dictating the terms of your employment
> . . . constituted a legitimate business reason for your dismissal . . .
> Therefore, your appeal is hereby denied.  I regret that there is no further
> recourse for your appeal.

[Doc. # 137, Exh. 24].  There is no indication that the determination was made by

an official appeal committee. Id.

McClain responded to the decision on March 13, 2006, noting that OSHA

failed to provide sufficient detail of its findings.  [Doc. #137, Exh. 25].  On

September 27, 2006, the Regional Administrator for OSHA responded with a fuller

description of its investigative findings with a cover letter that noted:

> [W]e are issuing another letter of dismissal, enclosed.  Because these
> Secretary's Findings were prepared after you had availed yourself of
> the right to appeal the dismissal, they also represent the conclusions
> reached by Mr. Fairfax, after a comprehensive review of the
> investigative file.  Hence, this is the final decision of the Secretary of
> Labor, not subject to further review.

[Doc. #146, Exh. 2]. The accompanying report further explained:

> After a comprehensive review of your investigative file, your appeal was
> denied by letter dated March 2, 2006.  Prior to the issuance of the
> November 17, 2005, letter and following OSHA's standard practice, you
> were informed by telephone of the reasons for your complaint's
> dismissal.  Now these Secretary's Findings are being issued in order to
> provide you with written documentation of those reasons. . .  In
> addition, please be advised that, because you've already availed
> yourself of the appeal process, there is no further appeal of this matter.

11

[Id.].

McClain filed a Complaint in Connecticut Superior Court on or about October 11, 2006.  [Doc. #1].  Pfizer removed the action to this Court on November 7, 2006 and McClain filed an Amended Complaint on February 20, 2007.  [Docs. ##1, 30].  On March 21, 2007, Pfizer filed a Motion to Dismiss and on March 7, 2008, the Court granted the Motion as to five claims that were based upon: breach of an oral employment contract and common law wrongful termination; promissory estoppel; defamation; negligent misrepresentation; and failure to keep a safe work environment.  [Docs. ##32, 83].

## Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor."  Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004)(internal citations omitted).  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."  Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted).  "The moving party bears the burden of showing that he or she is entitled to summary

12

judgment." <u>Huminski</u>, 396 F.3d at 69.  "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." <u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 105 (2d Cir. 2002)(internal citations omitted).  "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." <u>Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.</u>, 302 F.3d 83, 91 (2d Cir. 2002).

An action pursuant to § 31-51m is subject to the <u>McDonnell Douglas</u> burden shifting analysis.  <u>LaFond v. General Physics Servs. Corp.</u>, 50 F.3d 165, 172-73.  "To withstand a motion for summary judgment, a discrimination plaintiff must withstand the three-part burden-shifting [test] laid out by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973) . . . In a nutshell, a plaintiff first bears the 'minimal' burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a 'legitimate, nondiscriminatory reason' for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination." <u>McPherson v. New York City Dept. of Education</u>, 457 F.3d 211, 215 (2d Cir. 2006).

<u>Analysis of the Plaintiff's Claim Pursuant to § 31-51m</u>

The Plaintiff's first claim is made pursuant to Connecticut General Statute §

31-51m(b), which states:

> No employer shall discharge, discipline or otherwise penalize any
> employee because the employee, or a person acting on behalf of the
> employee, reports, verbally or in writing, a violation or a suspected
> violation of any state or federal law or regulation or any municipal
> ordinance or regulation to a public body, or because an employee is
> requested by a public body to participate in an investigation, hearing or
> inquiry held by that public body, or a court action.

Conn. Gen. Stat. § 31-51m(b).  The statute authorizes an employee to bring a civil

action "after exhausting all available administrative remedies . . . within ninety

days of the date of the final administrative determination or within ninety days of

such violation, whichever is later. . ."  Conn. Gen. Stat. § 31-51m(c).

As a preliminary matter, the Court considers Pfizer's argument that

McClain's § 31-51m claim is untimely in light of OSHA's March 2, 2006

correspondence.  Pfizer views this correspondence as a final determination of

her appeal that triggered the statutes' ninety day limitation.  While the Court

previously determined that McClain's Complaint was timely, in deciding Pfizer's

Motion to Dismiss, Pfizer asserts that the Court cited regulations that interpret an

inapplicable section of OSHA to identify the agency's practices with regard to the

investigation of whistleblower complaints.  [Doc. # 83].

The Court therefore treats Pfizer's argument as a Motion for

Reconsideration.  The Court's Local Rules note that:

> [m]otions for reconsideration shall be filed and served within fourteen
> (14) days of the filing of the decision or order from which such relief is

> sought, and shall be accompanied by a memorandum setting forth
> concisely the matters or controlling decisions which counsel believes
> the Court overlooked in the initial decision or order.

D. Conn. L. Civ. R. 7(c)1.  Pfizer's motion is therefore untimely.  The Court's ruling

was issued on March 7, 2008 and Pfizer has never requested leave to file a

motion for reconsideration outside of the fourteen-day period and fails to

ascertain opposing counsel's position and demonstrate "good cause" for the

extension of time as required by Local Rule 7(b).   The Court however, has

authority to revise its decision pursuant to Federal Rule of Civil Procedure 54(b)

and the doctrine of "law of the case":

> As most commonly defined, the doctrine of law of the case posits that
> when a court decides upon a rule of law, that decision should generally
> continue to govern the same issues in subsequent stages in the same
> case.  Application of the law of the case doctrine varies depending upon
> the context.  Although rulings of the district court are subject to revision by
> that court at any time before the entry of final judgment, under law of the
> case a trial court cannot reconsider on remand an issue decided by an
> appellate court.

Rezzonico v. H & R Block, Inc., 182 F.3d 144, 148-149 (2d Cir. 1999) (citing in part

Fed. R. Civ. P. 54(b), internal citations and quotations omitted).  The overriding

purpose of the Federal Rules of Procedure is to effect the just and efficient

resolution of legal disputes.  Fed. R. Civ. P. 1.  This overriding purpose requires

the elevation of substance over form.  As this case has not yet reached the stage

of final judgment, and this is an issue that has not been appealed to the Second

Circuit for decision, the Court will revisit its decision.

In determining that the March 2, 2006, letter to McClain was not OSHA's final decision, the Court cited 29 C.F.R. § 1978.109(c) to identify OSHA's procedure and determined:

> OSHA's initial ruling on a complaint can be appealed to an ALJ. When an ALJ rules on an appeal that ruling is stayed pending final review by the secretary of labor. The secretary of labor must then confirm the ALJ's decision in a final determination supported by a detailed explanation of the secretary's reasoning.

[Doc. # 83, pg. 8]. 29 C.F.R. § 1978 however applies to the Surface Transportation Assistance Act of 1982, which although part of OSHA, is inapplicable because it pertains to commercial motor vehicle safety. The Defendant notes that there is no regulation specifying the deadline for appealing a denial of a whistleblower complaint. In support of its claim that McClain's whistleblower claim is time-barred, Pfizer directs the Court to the United States Department of Labor Whistleblower Investigations Manual which was issued via a directive under the authority of John L. Henshaw, Assistant Secretary of Labor for OSHA. [Doc. #137, Exh. 63]. The manual notes in relevant part:

> For complaints which are dismissed by the Regional Administrator, the complainant is given the right to appeal the determination. Section 11(c) appeals are not specifically covered by statute or regulation, but are dealt with under longstanding OSHA policy and procedure. The appeal should be filed in writing within 15 days of the complainant's receipt of the region's dismissal letter, with copies to the RA and the Director of the Directorate of Compliance Programs. The case will be reviewed and a final decision made by the Appeals Committee, which consists of attorneys from SOL and OSHA officials assigned to OIA. The Appeals Committee may recommend litigation, return the case for additional investigation, or deny the appeal. The decision of the Appeals Committee, including a decision to deny an appeal, is final.

[Doc. #137, Exh. 63].  The manual does not justify the result that the Defendant advocates.

In this case, Thomas J. Guilmartin, an Area Director for OSHA communicated the dismissal of McClain's complaint on November 17, 2005, and instructed that an appeal of that determination would have to be filed with the Directorate of Compliance Programs within fifteen days. [Doc. #137, Exh. 21]. The letter does not indicate whether the complaint was ever reviewed by, and clearly shows that the decision was not made by the Regional Administrator. [Id.]. After receiving McClain's letter of appeal, dated December 2, 2005, Richard Fairfax, the Director of the Directorate of Compliance Programs responded on March 2, 2006 noting: "Based on a complaint and comprehensive review of the entire investigative file and related documents, I have concluded . . . your appeal is hereby denied.  I regret that there is no further recourse for your appeal." [Doc. # 137, Exh. 24].  The author communicated his individual conclusion regarding the dismissal of McClain's complaint and communicated the finality of his decision.  There is no evidence on the record that the case was ever reviewed or decided by OSHA's Appeals Committee, or that the Appeals Committee ever played a role in issuing that decision. [Id.].

Due to the lack of evidence on the record that the Regional Administrator played a role in the initial denial of the complaint, and the absence of any evidence on the record that the Appeals Committee considered and decided McClain's appeal, there is no evidence on the record that her claim is time barred.

17

Pfizer also contends that McClain cannot meet the <u>McDonnell</u> <u>Douglas</u> burden shifting framework that applies to claims under § 31-51m. [Doc. #135]. The Second Circuit has outlined the <u>McDonnell Douglas</u> burden shifting analysis that applies to § 31-51m claims:

> In an action under § 31-51m(b), the plaintiff would have the burden at the outset of proving by a preponderance of the evidence a prima facie case of retaliatory discharge as defined under the statute. Once the plaintiff has presented a prima facie case, the defendant would have the burden of articulating a legitimate, non-retaliatory reason for its action. If the defendant is able to articulate such a reason, the plaintiff would have an opportunity to show the reason was merely a pretext for retaliation. The ultimate burden of persuading the trier of fact that the defendant violated § 31-51m(b) would remain at all times with the plaintiff.

<u>LaFond v. General Physics Servs. Corp.</u>, 50 F.3d 165, 172-73 (internal citations omitted). Accordingly, to establish a <u>prima</u> <u>facie</u> case of retaliation pursuant to § 31-51m, McClain must demonstrate that (1) she engaged in protected activity; (2) that she was subsequently discharged from her employment; and (3) there was a causal connection between her participation in protected activity and her discharge.

The Second Circuit has noted that the nature of a plaintiff's burden of proof for a <u>prima</u> <u>facie</u> case of retaliatory discharge under § 31-51m is <u>de</u> <u>minimis</u>. <u>LaFond</u>, 50 F.3d at 173 (2d Cir. 1995). McClain has therefore established a <u>prima</u> <u>facie</u> case. As noted, Pfizer received notice of McClain's OSHA complaint on January 20, 2005, and subsequently terminated her on May 26, 2005. [Doc. # 137, Exh. 18].

McClain was therefore terminated within months of reporting safety and health concerns to OSHA.  The temporal proximity between her complaint and her termination raises "at least a genuine issue of material fact as to whether there was a causal connection between plaintiff's whistle-blowing activities" and her termination.  Ritz v. Town of East Hartford, 110 F.Supp.2d 94, 100 (D. Conn., 2000).

Pfizer has articulated a non-retaliatory motivation for its termination of McClain.  Pfizer notes that it terminated McClain due to her refusal to return to work despite receiving medical clearance to do so for eleven months.  Pfizer therefore cites job abandonment as a legitimate, nondiscriminatory reason for her termination.  See Mody v. General Elec. Co., No. 304cv358JCH 2006 WL 413439 (D. Conn. 2006) (recognizing job abandonment as a non-discriminatory reason for discharge).  Pfizer's claim of job abandonment is supported by the text of a letter it submitted to McClain during negotiations over her work conditions in October, 2004:

> On 10/12/04 you were scheduled to return to work following your leave of absence.  You returned to the site on 10/12/04 but have not been present at work since then.  As a result of your unexcused absence, you were placed on unpaid leave effective 10/16/04.  In order to continue your employment with Pfizer, you must return to work by 10/26/04.  If you fail to report to work on or before 10/26/04, you will be deemed to have abandoned your job and your employment with Pfizer will be terminated . . . If you do not return to work by 10/26/04, we will contact you regarding the terms of your separation from the Company.

[Doc. #146, Exh. 10].  Accordingly, the letter cited by the Defendant demonstrates that the Plaintiff was inclined to terminate McClain due to her extended leave of absence.

A reasonable jury however, could infer that Pfizer's proffered explanation is a pretext.  Evidence on the record indicates that Pfizer evaded discussions regarding workplace safety, and instead focused on issues such as details regarding Hambor's hostile confrontation with Plaintiff [Doc. #146, Affid. 1, para. 12, 15].  Evidence regarding Pfizer's evasion of discussions regarding safety calls Pfizer's explanation into doubt.  A reasonable jury could find that Pfizer's failure to address safety concerns that potentially related to McClain's illness and OSHA complaints created conditions unsuitable for her return and served as punishment for her safety complaints.  Accordingly, an issue of material fact exists as to whether Pfizer's proffered explanation is "merely a pretext for discrimination."  LaFond, 50 F.3d at 173 (2d Cir. 1995).   Pfizer's Motion for Summary Judgment is therefore denied as to McClain's §31-51m claim.

### Analysis of McClain's § 31-51q Claim

McClain also claims that Pfizer terminated her for engaging in constitutionally protected speech in violation of Connecticut General Statute § 31-51q.  The statute notes that:

> Any employer . . . who subjects any employee to discipline or discharge on account of the exercise by such employee of rights guaranteed by the first amendment to the United States Constitution or section 3, 4 or

> 14 of article first of the constitution of the state, provided such activity does not substantially or materially interfere with the employee's bona fide job performance or the working relationship between the employee and the employer, shall be liable to such employee for damages caused by such discipline or discharge[.]

Conn. Gen. Stat. § 31-51q.  McClain must therefore show "protected activity, adverse action, a causal relationship between the activity and the adverse action, and that the protected activity did not interfere with the central purposes of the employment relationship."  <u>Winik-Nystrup v. Manufacturers Life Ins. Co.</u> 8 F.Supp.2d 157, 159 (D. Conn., 1998).

To qualify as protected activity under this statute, McClain's "speech must be on a matter of public concern . . ." <u>Cotto v. United Technologies Corp.</u> 711 A.2d 1180, 1186. (Conn. App. Ct., 1998).  In contrast, when an employee "speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a [trial] court is not the appropriate forum in which to review the wisdom of a personnel decision taken by [an employer] allegedly in reaction to the employee's behavior." <u>Connick v. Myers</u>, 461 U.S. 138, 138-139 (1983) (addressing an analogous § 1983 wrongful discharge claim).

The Connecticut Supreme Court has noted "that it is within the province of the trial court to determine, as a matter of law, which topics are considered to be of public concern.  The resolution of whether an employee's statements address such a topic is, however, within the province of the jury, to be determined by looking to the content, form and context of the particular statements in question."

Daley v. Aetna Life and Cas. Co. 734 A.2d 112, 123  (Conn., 1999) (finding accord
between the Supreme Court's decision in Connick, 461 at 147-148 and the
Connecticut Supreme Court's decision in Schnabel v. Tyler, 646 A.2d 152, 163
(Conn., 1994).

    In this case, McClain's affidavit notes that shortly before her termination
she attended meetings with an understanding that laboratory safety would be
discussed but that Pfizer avoided the topic.  Instead, according to McClain, Pfizer
terminated her without providing her an "opportunity to have a meeting to
specifically discuss [her] safety concerns or provide assurances of a safe
environment."  [Doc. # 146, Affid. 1].  McClain was terminated within six months
of filing an OSHA complaint and just two days after submitting a letter requesting
information about "retrovirus and lentivirus infected embryonic stem cells used
by personnel in Building 118B, Lab 313 during 2002 through 2004." [Doc. # 146,
Exh. 3].  Connecticut courts recognize issues involving public safety, as an issue
of "public concern." Cotto, 711 A.2d at 1187 (citing Girgenti v. Cali-Con, Inc. 544
A.2d 655 (1988)).

    The Court notes evidence that McClain served on a Pfizer safety committee
on which she alleges having raised safety concerns and that she raised concerns
about the malfunctioning laminar hood that sickened not only scientists in the
laboratory, but also individuals that came on site to provide repair and cleaning
services.  [Doc. #146, Exh. 1].  Therefore the Court finds that speech relating to
the potential for a spread of a communicable illness to the larger public due to

22

safety issues such as the malfunctioning laminar hood and alleged mishandling of lentivirus establishes an issue of public concern.  Accordingly, it is for a jury to determine from the content, form, and context of McClain's complaints, the degree to which her speech addressed a threat to public safety caused by Pfizer's alleged inadequate response to the unidentified noxious fumes that were emitted by the laminar hood over a period of approximately one year and Pfizer's alleged mishandling of biohazardous lentivirus material.  Lowe v. AmeriGas, Inc., 52 F.Supp.2d 349, 359 (D.Conn., 1999) ("complaints about safety concerns regarding the improper storage of a hazardous substance such as propane, however, implicate matters of public concern and, thus, constitute protected speech.)

The Court also notes that there is enough evidence of a temporal proximity between both McClain's filing of an OSHA complaint and alleged efforts to discuss potential safety concerns, and her termination by Pfizer to  create an issue of material fact as to whether there was a causal relationship between her termination and engagement in protected activity.  Kennedy v. Coca-Cola Bottling Co. of New York, Inc., 170 F.Supp.2d 294, 300 (D.Conn.2001) (Noting that the Defendant "presents a weaker case, but at least raises an issue of fact in this regard due to the temporal proximity between his complaints to management about the drug use in the workplace and his termination.") Pfizer's motion for summary judgment as to McClain's §31-51q claim is therefore denied.

**Analysis of McClain's Willful and Wanton Misconduct Claim**

Connecticut courts have consistently "interpreted the exclusivity provision of the [Worker's Compensation Act], General Statues section 31-284(a), as a total bar to common law actions brought by employees against employers for job related injuries with one narrow exception that exists when the employer has committed an intentional tort or where the employer has engaged in willful or serious misconduct." <u>Suarez v. Dickmont Plastics Corp.</u> 639 A.2d 507, 510 (Conn., 1994). Accordingly, a successful willful and wanton misconduct claim is not precluded by the Worker's Compensation Act. For this tort claim, McClain must demonstrate that (1) she suffered harm; (2) that the defendant engaged in willful or serious tortuous conduct, and (3) that her harm resulted from that conduct. <u>See</u> <u>Warner v. Leslie-Elliot Constructors, Inc.</u> 479 A.2d 231, 237 (Conn., 1984) (noting that in an allegation of "willful conduct, the plaintiff must clearly plead that an accident was caused by the willful or malicious conduct of the defendants.")

In determining whether a Defendant's actions were willful or serious, the Connecticut Supreme Court noted that "a plaintiff employee [can] establish an intentional tort claim . . . by proving either [(1)] that the employer actually intended to injure the plaintiff (actual intent standard) or [(2)] that the employer intentionally created a dangerous condition that made the plaintiff's injuries substantially certain to occur (substantial certainty standard)." <u>Suarez</u>, 698 at

24

840-841.

In particular:

> [T]he substantial certainty standard requires that the plaintiff establish that the employer intentionally acted in such a way that the resulting injury to the employee was substantially certain to result from the employer's conduct.  To satisfy the substantial certainty standard, a plaintiff must show more than that [a] defendant exhibited a lackadaisical or even cavalier attitude toward worker safety . . . Rather, a plaintiff must demonstrate that his employer believed that its conduct was substantially certain to cause the employee harm.

Martinez v. Southington Metal Fabricating Co., 924 A.2d 150, 156 (Conn. App., 2007).

> The Connecticut Supreme Court has noted that:
>
> the exclusivity of the [Workers' Compensation Act] would not be eroded when the employee alleges an intentional tort by his supervisor . . . the distinction between the actor who is merely a foreman or supervisor, to which attribution of corporate responsibility for his or her conduct is inappropriate, and the actor who is of such a rank in the corporation under that he or she may be deemed the alter ego of the corporation under the standards governing disregard of corporate responsibility is appropriate.

(Suarez, 639 A.2d at 510-511). (Internal citations and quotation marks omitted).

The court has also noted that an employer's subsequent ratification of a supervisor's offensive conduct, as opposed to behavior that has been directed or authored by the employer, is insufficient. Id. at 511.

Accordingly, the Plaintiff's claim survives only with evidence supporting an inference that an "alter ego" of Pfizer either intended for McClain's specific injury, or engaged in behavior that was substantially certain to cause the Plaintiff's injury.  The evidence on the record cannot withstand this scrutiny.  Even viewing the record in a light most favorable

to McClain, a reasonable jury cannot conclude that Pfizer was aware that its actions would cause the Plaintiff harm, in part because even McClain is unable to identify, beyond conjecture, what has caused her illness.  At best, McClain speculates that she either had unintended contact with lentivirus material due to Blakes' work with transduced cells on a common laboratory surface, or that noxious fumes emitted by the laminar hood during parts of 2002 and 2003 included an airborne pathogen.  In either scenario, McClain fails to demonstrate that her alleged injury was substantially certain to result from Pfizer's conduct.

The record indicates that Pfizer regularly maintained the laminar hood prior to experiencing problems and took numerous steps to correct the problems once they arose. [Doc. #146, Exh. 1].  Similarly, the record reflects that although transduced cells were brought to lab area 313 for the purpose of analyzing cells on a flow cytometer, the cultures were "washed" free of live virus before leaving laboratory 257, and that the viral line was, and still is, believed to lack genes for replication. [Doc. #137, Exhs. 2-4; Doc. # 144, Exhibit 3].  Accordingly the record indicates that 1) Pfizer did not engage in conduct that was substantially certain to result in her injury and 2) a lack of evidence that any awareness of risk would extend beyond her co-workers and supervisors to an "alter ego" of the corporation.  In sum, McClain fails to show "more than a mere failure to provide appropriate safety or protective measures, and that the plaintiff's injury

26

was the inevitable and known result of the actions required of [her] by the defendant." <u>Suarez</u>, 639 A.2d at 513.

To be sure, this case is very distinct and different from <u>Suarez</u>, where the Connecticut Supreme Court found a material issue of fact as to whether the plaintiff's injury was substantially certain to follow from the employer's conduct. <u>Id</u>. In that case, the plaintiff was severely injured while attempting to remove hot molten plastic from a plastic molding machine in compliance with the employer's requirement that employees clean the machine while it was in operation, and the Defendant denied employee requests to use safer, alternative methods. <u>Id.</u> at 508-509. The record for that case included evidence that the plaintiff was warned that he would be fired by the company for refusing to clean an active machine and an opinion by a physical engineer that described the structure of the device and the inherent danger involved in cleaning the device while it was still in operation. <u>Id.</u> at 508-509. The expert also specifically detailed how the practice violated existing safety standards that prohibit employees from inserting hands into an active device of the molding machine's type. <u>Id.</u> at 509. Accordingly, <u>Suarez</u> differs greatly from the instant action, because in that case, evidence demonstrated corporate responsibility for the conduct in question, and that injury was certain to follow from the Defendant's instructions.

In addition, McClain's action differs as the record does not demonstrate the likelihood that either the exposure to noxious fumes or lentivirus caused

her current illness beyond mere speculation:

> Although an affidavit by an expert may be considered in opposition to a motion for summary judgment, conclusory affidavits, even from expert witnesses, do not provide a basis on which to deny such motions. DaGraca v. Kowalsky Bros., Inc. 919 A.2d 525, 533 (Conn. App., 2007) (noting

that summary judgment was appropriate because Plaintiff failed to "meet the high threshold of substantial certainty."); See also Newport Electronics, Inc. v. Newport Corp., 157 F.Supp.2d 202, 212 (D. Conn. 2001) (subjecting affidavit to same level of scrutiny).  Accordingly, conclusory statements, by both McClain and her designated expert, speculating about potential causes of McClain's illness without demonstrating its probability, falls short of meeting the substantial certainty requirement that this claim demands. [Doc. #146, Affids. 1-2].  Pfizer's motion for summary judgment is therefore granted as to McClain's common law claim of willful and wanton misconduct.

> Conclusion

The Defendant's motion for summary judgment [Doc. #134] is GRANTED as to the Plaintiff's common claim of willful and wanton misconduct, but is DENIED as to the Plaintiff's "whistleblower" claim made pursuant to § 31-51m, and the Plaintiff's free speech claim made pursuant to §31-51q.

IT IS SO ORDERED.

_____/s/_____

Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  February 26, 2010.